MICHAEL K. JEANES
Clerk of the Superior Court
By sheila ponicki, Deputy
Date 12/22/2011 Time 14:03:28
Description                    Amount
-------- CASE# CV2011-021036 --------
CIVIL NEW COMPLAINT            301.00

TOTAL AMOUNT                   301.00
           Receipt# 21845248

1  Anthony Martino
   580 Vernon Lane
2  Buffalo Grove, IL 60089
   847-977-4128
3

4

5

6           IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

7                 IN AND FOR THE COUNTY OF MARICOPA

8
                                          )
9  ANTHONY MARTINO, a single man;         )         CV2011-021036
                                          )    COMPLAINT
10 Plaintiff                              )
                                          )
11 vs.                                    )
   GREYSTAR INVESTMENT GROUP LLC, a Delaware)
12 limited liability company; GREYSTAR    )
   MANAGEMENT SERVICES LIMITED PARTNERSHIP, a)
13 Delaware limited partnership; GREYSTAR )
   DEVELOPMENT AND CONSTRUCTION, L.P., a
14 Texas limited partnership, GREP GENERAL
   PARTNER, LLC, a South Carolina limited
15 liability company; GREYSTAR REAL ESTATE
   PARTNERS, LLC, a South Carolina limited
16 liability company; CORTLAND INVESTORS LLC,
   an Oregon limited liability company;
17 DISCOVERY PARK INVESTMENTS, LLC, a
   Washington limited liability company;
18 BEAN-RIO SALADO EQUITY, LLC, an Oregon
   limited liability company; GNDD I, LLC, an
19 Oregon limited liability company; PFS
   XIII, LLC, an Oregon limited liability
20 company; SCHNITZER-ABRAMS PARTNERSHIP, an
   Oregon general partnership; RIVER ROAD,
21 LLC, an Oregon limited liability company;
   WILL SPRIETSMA LIVING TRUST, a California
22 private trust;  9837 TABOR ST LP, a
   California limited partnership; TILDEN AVE
23 LP, a California limited partnership;
   VICTOR PROPERTY MANAGEMENT, INC., a
24 California Corporation; MITTLEMAN
   PROPERTIES PARTNERSHIP, an Oregon general
25

26

27                    [Summary of pleading] - 1

28

partnership; WILLIAM ZEMSKY, a single man; 2311 NORTHRUP, LLC, an Oregon limited liability company; FRISCH INVESTMENTS, LLC, an Oregon limited liability company; 4106 INGLEWOOD BLVD., L.P., a California limited partnership; HGB RIO SALADO, LLC, an Oregon limited liability company; JOHN DOES and JANE DOES 1 THROUGH 10; and ABC CORPORATIONS, or PARTNERSHIPS 11 through 20;

Defendants

COMES NOW, Plaintiffs, pro se, and for their complaint state and allege as follows:

1. Plaintiff was at all times relevant herein a resident of the State of Arizona.

2. Defendant GREYSTAR INVESTMENT GROUP, LLC is and at all relevant times herein, was a Delaware limited liability company; and at all times relevant herein had a principal place of business located within Maricopa County.

3. Defendant GREYSTAR MANAGEMENT SERVICES LIMITED PARTNERSHIP is and at all relevant times herein, was a Delaware limited partnership; and at all times relevant herein had a principal place of business located within Maricopa County.

4. Defendant GREYSTAR DEVELOPMENT AND CONSTRUCTION, L.P., is and at all relevant times herein, was a Texas limited partnership; and at all times relevant herein had a principal place of business located within Maricopa County.

5. Defendant GREP GENERAL PARTNER, LLC, is and at all

[Summary of pleading] - 2

relevant times herein, was a South Carolina limited liability company; and at all times relevant herein had a principal place of business located within Maricopa County.

6. Defendant GREYSTAR REAL ESTATE PARTNERS, LLC, is and at all relevant times herein, was a South Carolina limited liability company; and at all times relevant herein had a principal place of business located within Maricopa County.

7. Defendant CORTLAND INVESTORS LLC, is and at all relevant times herein, was an Oregon limited liability company; and at all times relevant herein had a principal place of business located within Maricopa County.

8. Defendant CORTLAND INVESTORS LLC, is and at all relevant times herein, was an Oregon limited liability company; and at all times relevant herein had a principal place of business located within Maricopa County.

9. Defendant DISCOVERY PARK INVESTMENTS, LLC, is and at all relevant times herein, was a Washington limited liability company; and at all times relevant herein had a principal place of business located within Maricopa County.

10. Defendant BEAN-RIO SALADO EQUITY, LLC, is and at all relevant times herein, was an Oregon limited liability company; and at all times relevant herein had a principal place of business located within Maricopa County.

11. Defendant GNDD I, LLC, is and at all

[Summary of pleading] - 3

relevant times herein, was an Oregon limited liability company; and at all times relevant herein had a principal place of business located within Maricopa County.

12. Defendant PFS XIII, LLC, is and at all relevant times herein, was an Oregon limited liability company; and at all times relevant herein had a principal place of business located within Maricopa County.

13. Defendant SCHNITZER-ABRAMS PARTNERSHIP, is and at all relevant times herein, was an Oregon general partnership; and at all times relevant herein had a principal place of business located within Maricopa County.

14. Defendant RIVER ROAD, LLC, is and at all relevant times herein, was an Oregon limited liability company; and at all times relevant herein had a principal place of business located within Maricopa County.

15. Defendant WILL SPRIETSMA LIVING TRUST, is and at all relevant times herein, was a California private trust; and at all times relevant herein had a principal place of business located within Maricopa County.

16. Defendant 9837 TABOR ST LP, is and at all relevant times herein, was a California limited partnership; and at all times relevant herein had a principal place of business located within Maricopa County.

17. Defendant TILDEN AVE LP, is and at all

relevant times herein, was a California limited partnership; and at all times relevant herein had a principal place of business located within Maricopa County.

18. Defendant VICTOR PROPERTY MANAGEMENT, INC., is and at all relevant times herein, was a California corporation; and at all times relevant herein had a principal place of business located within Maricopa County.

19. Defendant MITTLEMAN PROPERTIES PARTNERSHIP, is and at all relevant times herein, was an Oregon general partnership; and at all times relevant herein had a principal place of business located within Maricopa County.

20. Defendant WILLIAM ZEMSKY, is and at all relevant times herein, was a California resident; and at all times relevant herein had a principal place of business located within Maricopa County.

21. Defendant 2311 NORTHRUP, LLC, is and at all relevant times herein, was an Oregon limited liability company; and at all times relevant herein had a principal place of business located within Maricopa County.

22. Defendant FRISCH INVESTMENTS, LLC, is and at all relevant times herein, was an Oregon limited liability company; and at all times relevant herein had a principal place of business located within Maricopa County.

23. Defendant 4106 INGLEWOOD BLVD., L.P, is and at all

relevant times herein, was a California limited partnership; and at all times relevant herein had a principal place of business located within Maricopa County.

24. Defendant HGB RIO SALADO, LLC, is and at all relevant times herein, was an Oregon limited liability company; and at all times relevant herein had a principal place of business located within Maricopa County.

25. Defendants JOHN DOES and JANE DOES 1 THROUGH 10; AND ABC CORPORATIONS, OR PARTNERSHIPS 11 THROUGH 20 are unidentified defendants believed to be liable to Plaintiff through their acts and/or omissions. Once discovery is completed and Plaintiff learns the true identities of these "DOE" Defendants their proper name will be substituted.

26. All acts and omissions alleged herein occurred within Maricopa County in the State of Arizona.

27. The claims herein exceed the minimum jurisdictional requirements of this Court and jurisdiction and venue are proper.

**COUNT ONE-NEGLIGENCE**

28. Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

29. At all times relevant herein, each any every named Defendant in paragraphs 2 through 25 of this Complaint owed a duty of care to the Plaintiff to not create an unreasonable risk of foreseeable harm to the Plaintiff.

30. On November 12th, 2011, Defendants breached their standard duty of care and violated A.R.S 33-1323 when they leased and supplied possession of a

three-bedroom apartment (apt.1108) to Plaintiff; the apartment of which was already in non-compliance with A.R.S 33-1324 prior to November 12th, 2011, and therefore, legally uninhabitable both prior to and during Plaintiff's occupancy.

31.    The apartment was uninhabitable because, inter alia, it had been previously damaged by water infiltration of which had not been discovered, properly remediated, or otherwise repaired, resulting in the explosive growth of atypically-excessive levels of mold within an indoor environment, an infestation of insects, and fire/safety-hazardous electrical appliances.

32.    Each any every named Defendant in paragraphs 2 through 25 of this Complaint knew or should have known that the apartment was uninhabitable and that leasing the uninhabitable apartment would subject Plaintiff's person and property to the explosive growth of mold.

33.    The exposure to the explosive growth of mold spores within both the air and interior walls of the apartment as lab tested on November 28th, 2011 actually and proximately caused damages to the Plaintiffs' person and property.

34.    On the early morning of Wednesday, November 23rd, 2011, Plaintiff put in a written maintenance request through Defendant's primary website, www.thepalmsonscottsdale.com, specifically noting in the written maintenance request that he believed that there was visual mold growth within the interior of the kitchen dishwasher, and that the dishwasher would need to be replaced.  Plaintiff's maintenance request went ignored until Friday, November 25th, 2011.

1   35. On Friday, November 25th, 2011, one of Defendant's maintenance technicians entered Plaintiff's apartment for the first time to inspect the dishwasher, and falsely stated to Plaintiff that both the mold-like substance identified within the dishwasher and the stench that had been increasingly pervading the air of the apartment since Plaintiff's initial occupancy on November 14th, 2011 "were of no concern," and that he'd "be back in a few hours to clean the interior of the dishwasher."

36. Upon returning to Plaintiff's apartment later on Friday, November 25th, 2011 with the intention of cleaning the interior of the dishwasher, Defendant's maintenance technician was greeted at the door by Plaintiff's father who had traveled to Arizona to visit Plaintiff for the Thanksgiving holiday the day prior.  Plaintiff's father requested that Defendant's maintenance technician inspect the wall directly behind the refrigerator in the kitchen, since earlier in the same day Plaintiff's father had seen several cockroaches exiting from behind it and into the main area of the kitchen.

37. Defendant's maintenance technician pulled out the refrigerator from the interior wall of the kitchen and noticed brown staining towards the bottom of the wall.  Using a moisture meter, Defendant's maintenance technician confirmed that the kitchen wall was significantly wet with a meter finding of 33% MC.

38. Defendant's maintenance technician immediately left Plaintiff's apartment for approximately one additional hour, stating that he was going to "look into the potential causes of the water moisture within Plaintiff's apartment."

[Summary of pleading] - 8

39. Defendants knew or should have known that building components impacted by water damage for an unknown duration period, or a duration period reasonably calculated or believed to be substantial, presented the necessary elements for mold growth to have already occurred general, and for mold growth to have already been impacting the air within Plaintiff's leased apartment.

40. Without taking any precautionary measures to avoid potential mold spore disruption, and without notifying Plaintiff of their intended explorative actions, Defendant's maintenance technicians immediately began demolition of water-damaged drywall within a vacant/unleased storage room of which was directly adjacent and adjoined to the kitchen and laundry room of Plaintiff's apartment.

41. Upon re-entering Plaintiff's apartment later on Friday, November 25th, 2011 Defendant's maintenance technician stated to Plaintiff that an active water infiltration was occurring from an "unknown source" within the interior walls of Plaintiff's kitchen and laundry room, and also within the interior wall of the vacant/unleased storage room within the apartment complex.

42. Defendant's maintenance technician informed Plaintiff that the storage room's primary wall directly borders and is adjoined to the interior kitchen and laundry room walls of Plaintiff's apartment, and that the water infiltration had "penetrated from the storage room into Plaintiff's apartment causing the moisture and visible mold growth in the lower kitchen cabinets and dishwasher".

43. Defendant's maintenance technician stated to Plaintiff and Plaintiff's father that he was "uncertain" as to how long the water infiltration had been ongoing, but that he believed it had "been leaking for months or longer."

44. Defendants could not and cannot factually determine how long the water damage within Plaintiffs' apartment and the bordering common storage room wall went undiscovered prior to November 25th, 2011; the water damage of which directly caused the explosive growth of mold within Plaintiff's apartment.

45. Defendants failed to call for a licensed water/mold remediation company despite having the constructive knowledge of what they reasonably calculated to be "Category 3" water damage and visual mold growth within both Plaintiff's apartment and the adjacent and adjoined vacant/unleased storage room. Defendant's knowledge was constructive as directly pursuant to A.R.S 33-1313.

46. Instead, for unclear and unstated reasons, Defendant's maintenance technicians attempted to tape a plastic containment along the laundry room and kitchen walls of Plaintiff's apartment, while subsequently choosing to independently undertake the demolition of the water damaged interior wall of the vacant/unleased storage room of which was adjoined to the kitchen and laundry room of Plaintiff's leased apartment. The plastic containment was not prepared in accordance with any professional standard regarding water damage and mold spore containment for an indoor environment. Additionally, the plastic containment was not thoroughly fastened to the interior walls of Plaintiff's kitchen and laundry room, was not used/taped along the entire

[Summary of pleading] - 10

kitchen wall of Plaintiff's apartment but only half the kitchen wall while leaving the other half exposed, and stood approximately only three feet in height off the ground. Therefore, the plastic containment was more likely than not mechanically and technically inefficient in sealing off or preventing actual mold spore disruption between the adjacent storage room wall of which Defendant's maintenance technicians had just previously demolished and the interior walls of Plaintiff's apartment; the interior walls of Plaintiff's apartment of which had already contained significant structural damage, warping, crumbling, and holes due to longstanding undiscovered water damage even prior to Defendant's maintenance technician's previous demolition of the adjacent storage room wall of which was directly adjoined. As such, the improper maintenance actions of Defendants maintenance staff created unnecessary mold spore disruption, and contributed to both the overall uninhabitability of Plaintiff's apartment and damages to Plaintiff's person and property.

47. On November 26th, 2011, Plaintiff independently consulted with a 3rd party certified home and mold inspector whom conducted mold sampling within Plaintiff's apartment on that same date. Per lab findings obtained by Plaintiff on November 28th, 2011, mycotoxin-producing molds such as Stachybotrys Chartarum (amongst others such as Aspergillus/Penicillium) were found at 100 times greater within the air of the apartment than found in the outdoor air sample, 10,000 times greater in the kitchen wall of the apartment than in the outdoor air sample, and 3200 times greater in the laundry room wall than in the outdoor air sample. Additionally, per moisture meter testing performed by the certified home and mold inspector, the laundry room

[Summary of pleading] - 11

wall yielded a 99.9% MC finding, indicating a severe ongoing water leak, as well as a fire/safety hazard due to the close proximity of the moisture to active electrical outlets/running appliances (washer/dryer). The excessive levels of mold within Plaintiff's apartment proximately and actually caused damages to Plaintiff's person and property.

### COUNT TWO-CONSTRUCTIVE EVICTION

48. The Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1-47 above.

49. On November 12th, 2011, each any every named Defendant in paragraphs 2 through 25 of this Complaint breached their implied warranty of habitability, and breached their standard duty of care in violating A.R.S 33-1323 when they leased and supplied possession of a three-bedroom apartment (apt.1108) to Plaintiff; the apartment of which was already in non-compliance with A.R.S 33-1324 prior to November 12th 2011, and therefore, legally uninhabitable both prior to and during Plaintiff's occupancy.

50. The apartment was uninhabitable because, inter alia, it had been previously damaged by water infiltration of which had not been discovered, properly remediated, or otherwise repaired, resulting in the explosive growth of atypically-excessive levels of mold within an indoor environment, an infestation of insects, and fire/safety-hazardous electrical appliances.

51. Each any every named Defendant in paragraphs 2 through 25 of this Complaint, knew or should have known that the apartment was uninhabitable and that leasing the uninhabitable apartment would breach the implied warranty of habitability, subject Plaintiff's person and property to the explosive growth of mold, and subject Plaintiff to incur undue monetary expenses.

52. In leasing the three-bedroom apartment from Defendants on November 12th 2011, Plaintiff paid $922.78 to Defendants, calculated as $835.28 for the pro-rated first month of rent, and $87.50 as a non-refundable security deposit. The moneys were paid to Defendants in good faith at the immediate signing of the rental agreement on November 12th, 2011 and with the expectation of Defendant's implied warranty of habitability of the apartment. Due to the remote/hidden locations of water and mold damage within the apartment, Plaintiff was entirely unaware of the apartment's uninhabitability at the immediate time of occupancy beginning on November 12th, 2011.

53. As pursuant to A.R.S 33-1313, Defendants were factually and constructively aware of visual mold growth in Plaintiff's apartment on November 23rd, 2011 per Plaintiff's written maintenance request, and factually and constructively aware of the apartment's uninhabitability on November 25th, 2011 per their own inspection of Plaintiff's apartment.

54. On November 25th, 2011, upon their own inspection of both the interior of Plaintiff's apartment and the interior of the vacant/unleased storage room of which is adjoined to the interior walls of Plaintiff's kitchen and laundry room, Defendants verbally admitted that Plaintiff's leased apartment was uninhabitable due to the longstanding undiscovered water infiltration and visual mold growth of which had begun forming within the dishwasher and kitchen cabinets.

55. On November 25th, 2011 Defendant's property manager (LeAnn) stated to Plaintiff that the apartment complex's maintenance staff would begin demolition and re-construction of the interior of Plaintiff's kitchen and laundry room "as soon as possible," not having considered the fact that the

1  apartment was already impacted by mold spore infestation due both to the
2  unknown but substantial duration period of the water damage having gone
3  undiscovered, the visual mold growth in Plaintiff's kitchen, the stench
4  pervading the air of the apartment, as well as Defendant's previous improper
5  maintenance actions in their demolition of the water-damaged interior storage
6  room wall (adjoined to Plaintiff's apartment) and subsequent improper setup
7  of a plastic containment within Plaintiff's kitchen and laundry room.

8  56. In light of Plaintiff and other authorized tenants of the rental
9  agreement being without access to operable sleeping quarters, kitchen, or
10 laundry room facilities for an "indefinite" period of time during the
11 demolition and re-construction of the interior of Plaintiff's apartment due
12 to water infiltration and mold damage, Defendant's property manager (LeAnn)
13 provided Plaintiff with a key to a one-bedroom model apartment within the
14 complex premises and requested that Plaintiff and other named tenants of the
15 rental agreement remain in it until the leased apartment had been entirely
16 remediated, but did not consider the fact that placing three occupants into a
17 one-bedroom apartment unit is generally unreasonable and also a violation of
18 Arizona's presumed occupancy limitation of two persons per bedroom as
19 directly pursuant to A.R.S 33-1317(F).

20 57. Despite Plaintiff's request to permanently transfer to an
21 alternative apartment unit within the Complex instead of awaiting repair of
22 the already leased but uninhabitable apartment unit, Defendants declined,
23 stating that "none were available" but that the remediation process within
24 Plaintiff's already leased apartment "would be expedited".

[Summary of pleading] - 14

1  58. Defendants refused Plaintiff's request in offering back any
2  already-paid rent or future rent reimbursements, moving cost reimbursements,
3  or utility reimbursements despite Plaintiff's leased apartment from
4  Defendants being legally uninhabitable since Plaintiff's signing of the
5  rental agreement and initial occupancy of the apartment on November 12th,
6  2011.  Instead, Defendant's property manager requested that Plaintiff
7  "contact his rental insurance provider" for any already incurred or future
8  out of pocket expenses, specifically stating to Plaintiff that the
9  circumstances occurring within Plaintiff's leased apartment were a "non-
10 liability situation" for Defendants since they "had been unaware of the water
11 infiltration".

12 59. Per medical recommendation, the uninhabitability of the leased
13 apartment, and Defendant's declination in providing Plaintiff with an
14 alternative apartment unit within the Complex to transfer-to from the
15 uninhabitable leased apartment, Plaintiff voluntarily vacated the leased
16 apartment and returned all received keys to Defendants on November 30th, 2011.
17 An agent of the Defendants signed for a receipt of delivery for the returned
18 keys on November 30th, 2011.

19 60. Due to having been displaced from a permanent residence after
20 having been constructively evicted from the leased uninhabitable apartment,
21 Plaintiff suffered undue monetary expenses and emotional distress.

22 61. During Plaintiff's occupancy of the apartment beginning on November
23 12th, 2011, Defendants failed to ever tender and deliver to Plaintiff or any
24 other named authorized occupant of the leased apartment a signed copy of the
25 rental agreement as directly pursuant to both A.R.S 33-1321(C) and A.R.S 33-

[Summary of pleading] - 15

1322 (E), despite numerous requests made to Defendants by Plaintiff and/or other authorized tenants named within the rental agreement. As such, Defendants were at all times relevant herein in material non-compliance with the rental agreement and in violation of the Arizona Residential Landlord & Tenant Act.

62. During Plaintiff's occupancy of the apartment beginning on November 12th, 2011, Defendants failed to comply with all other subsections (A through D) of A.R.S 33-1322, and thus, Defendants were at all times relevant herein in material non-compliance with the rental agreement and in violation of the Arizona Residential Landlord & Tenant Act.

63. Plaintiff re-alleges that all of the allegations contained in paragraphs 48-62 above actually and proximately caused damages to Plaintiffs' person and property, and subjected Plaintiff to incur additional undue monetary expenses.

WHEREFORE, having stated their causes of action, Plaintiff prays for relief as follows:

    a.    For general damages to be proven at jury trial;

    b.    For special damages to be proven at jury trial;

    c.    For costs of suit;

    d.    For any such other and further relief which the court deems to be fair, equitable and just.

DATED this 22nd day of December, 2011.

By _____
Anthony Martino
Pro Se Plaintiff

[Summary of pleading] - 16